**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| GENOME COSMETICS, LLC | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 16-cv-3405 |
| | ) | |
| v. | ) | |
| | ) | |
| RNA CORPORATION | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT AT LAW**

Plaintiff, GENOME COSMETICS, LLC, by its attorneys, McVEY & PARSKY, LLC, and complaining of Defendant, RNA CORPORATION, states as follows:

**PARTIES**

1. Plaintiff Genome Cosmetics, LLC ("Genome") is a Delaware limited liability company with its principal place of business in Bensalem, Pennsylvania. Genome does business as Obey Your Body ®. The members of Genome are Giora Shamir, a citizen of Pennsylvania; Yona Engel, a citizen of California; Luis Fuentes, a citizen of Pennsylvania; Yolanda Cruz, a citizen of Pennsylvania; and Kathie Ashenfelder, a citizen of Pennsylvania.

2. Defendant RNA Corporation ("RNA") is an Illinois Corporation with its principal place of business in Blue Island, Illinois.

**JURISDICTION AND VENUE**

3. Jurisdiction of this Court is invoked based upon diversity of citizenship of the parties, pursuant to 28 U.S.C. 1332, as this action is between citizens of different states, and the matter in controversy in the action exceeds the sum of $75,000, exclusive of interest and costs.

4. Venue is properly laid in the Northern District of Illinois pursuant to 28 U.S.C. 1391, as a substantial part of the events giving rise to this claim occurred within this district, and because defendant is subject to personal jurisdiction here.

## BACKGROUND

5. Prior to December 6, 2013, Genome contacted RNA to inquire about the possibility of RNA manufacturing certain skin care products for sale throughout the United States.

6. On December 6, 2013, Genome wired to RNA a deposit of $25,000 for research and development so that RNA could determine whether it would be able to manufacture the skin care products.

7. On or about May 21, 2014, RNA sent to Genome a Price List and Terms setting out the costs to manufacture twenty (20) of Genome's products. Genome agreed to RNA's pricing.

8. During the summer of 2014, Genome had several of its products tested by an independent testing laboratory to ensure that these products complied with the Food and Drug Administration ("FDA") guidelines regarding Sun Protection Factor ("SPF"). Genome's products passed the tests and these results were passed along to RNA.

9. On or about February 25, 2015, RNA sent pricing and terms to Genome for six (6) products. Three of the products quoted were products that were originally included in the May 21, 2014, price list. RNA increased the cost to manufacture these three products.

10. That same day, Genome sent to RNA a purchase order for the manufacture of many of Genome's skin care products. The prices that Genome used in the purchase order were

those from the May 21, 2014, price list. The purchase order also included a credit for $25,000 for the initial deposit on December 6, 2013.

11. On March 3, 2015, RNA resent to Genome the original pricing from May 21, 2014, as well as the price list of February 25, 2015. RNA also acknowledged receipt of the purchase order. These statements led Genome to reasonably believe that RNA was reiterating its prior agreement to manufacture Genome's products for the cost listed in the price lists. RNA did not object to the inclusion of the $25,000 credit or to the use of the prices in the May 2014 price list. RNA did not mention the possibility of any price increases to Genome.

12. On or about March 16, 2015, representatives from Genome visited RNA's facility to check on the progress of Genome's products and to address other issues. At this meeting, Genome and RNA discussed the increase in pricing for the Obey Your Body ® Soothing After-Shave Balm. The price per unit had increased from $0.74 in May 2014 to $1.01 in February 2015, without explanation. RNA agreed to reduce the price to $0.91 per unit. RNA did not mention the possibility of any other price increases to Genome and said nothing about Genome's $25,000 credit.

13. Approximately two (2) days later, on or about March 18, 2015, RNA claimed that the $25,000 had been applied to the creation of certain samples requested in January 2015 by Genome's then current president Avi Shavit. RNA claimed that Mr. Shavit had agreed to this use of the $25,000 credit verbally during a telephone conversation with RNA's owner Muhammad Akhtar, although RNA could not produce any documents to substantiate its claim. Genome had no record that Mr. Shavit ever agreed to use the $25,000 credit in this manner.

14. On March 25, 2015, RNA e-mailed Genome regarding the production of Genome's products. RNA stated that it would be entering the formulas into its system so that it

3

could place orders for chemicals by the following week. RNA also said that it would take 6-8 weeks for the chemicals to arrive at its facility once they had been ordered. RNA did not mention the possibility of any price increases to Genome. Based upon RNA's representations, Genome reasonably expected that RNA would start manufacturing the products no later than May 27, 2015, at the prices set forth in the May 2014 and February 2015 price lists.

15. On or about May 22, 2015, Giora Shamir of Genome spoke with Muhammad Akhtar regarding the status of Genome's products. Mr. Akhtar stated that there would be price increases for only 2 or 3 products.

16. However, a few days later, RNA forwarded a third price list to Genome for the production of Genome's products. This new price list substantially raised the cost per unit on fourteen (14) products, contrary to RNA's previous representation that only 2 or 3 products would experience price increases. On average, the price for each product increased more than fifty (50%) from the May 2014 price list. RNA gave no explanation to Genome for these sudden and substantial price increases.

17. Mr. Shamir wrote to RNA on June 1, 2015, objecting to the price increases for eleven (11) of the products. Mr. Shamir also reminded RNA that Genome was under time constraints and that RNA's delays in producing the products was costing Genome money. He stated that Genome did not approve the price changes unless RNA had a reasonable explanation.

18. On June 4, 2015, RNA responded to Genome regarding the price increases. RNA agreed to reduce the prices on seven (7), although the prices were still higher than they had been in the May 2014 price list. RNA offered no explanation why it was not able to comply with the original prices from the May 2014 price list.

19. RNA claimed that it could not reduce the prices on four (4) SPF products because those products had to be modified for testing and stability due to the previous formula not being stable. However, this was the first time that RNA claimed that there was a problem with these formulas, despite the fact that RNA had the 2014 testing resulting showing that all the products met FDA guidelines for SPF products.

20. RNA claimed that it could not lower the prices of three (3) other products because of a change in an ingredient and the need to order a custom color.

21. Although Genome continued to object to the higher prices, RNA made only minor reductions to some of the prices.

22. Faced with increasingly tight deadlines to begin production of its products for sale to the general public, Genome had no choice but to agree to RNA's unilateral price increases for ten (10) of its products.

23. Therefore, on June 17, 2015, Genome and RNA signed a fourth price list with the substantially higher prices for the production of Genome's products.

24. RNA agreed to produce all quantities of Genome's products within 6 to 8 weeks of June 16, 2015. Thus, RNA promised Genome that all products would be produced by no later than August 11, 2015.

25. Almost immediately, however, Genome started experiencing problems with RNA's production schedule and quality of the products.

26. On or about July 13, 2015, RNA informed Genome that 3,360 tubes of product out of a total order of 5,640 tubes had been damaged or otherwise wasted. Although RNA agreed to credit Genome for the tubes that were damaged or wasted, RNA refused to pay for the expedited shipping of new tubes necessitated by RNA's damage and waste. Thus, Genome was

forced to incur the cost of shipping the new tubes so that it could meet its deadlines for the sale of the product.

27. RNA also failed to meet the August 11, 2015, deadline to manufacture all of Genome's products. As a result, Genome was forced to incur additional costs to ship older products to various markets in order to cover the shortfall.

28. RNA did not complete production and shipment of Genome's products until November 2015, three months after its promised deadline. RNA's failure to comply with the production schedule caused Genome to experience lost sales due to unavailability of its products.

29. Furthermore, in several instances RNA's shipments to Genome did not contain the full amount of the products that Genome ordered. RNA's failure to ship the full amount of product that Genome ordered also caused Genome to experience lost sales.

30. On or about November 13, 2015, Genome wrote to RNA outlining the various problems that Genome had experienced and seeking a mutually agreeable resolution.

31. RNA did not respond to Genome's written correspondence until December 21, 2015. RNA only addressed its unilateral price increases from May 2015 and refused to reconsider its position. RNA did not address any of the problems that Genome experienced once RNA started manufacturing Genome's products.

## COUNT I – BREACH OF CONTRACT – PRICE INCREASES

32. Genome hereby incorporates the averments set forth in paragraphs 1 through 31, above, as if set forth in full herein in this paragraph 32.

33. On or about May 24, 2014, Genome agreed to the prices outlined in RNA's price list for RNA to manufacture Genome's skin care products.

34. On or about February 25, 2015, RNA revised the prices for three of the products.

35. On March 3, 2015, RNA resent the May 24, 2014, and February 25, 2015, price lists to Genome, demonstrating RNA's intent to be bound by the prices set forth in these two price lists. Genome again agreed to the prices contained in the price lists.

36. Genome performed all material conditions, covenants, and promises required on its part to be performed according to the terms and conditions of the price lists.

37. RNA breached the price lists by unilaterally raising the prices of certain of Genome's products without warning or justification and by failing to properly credit Genome for the $25,000 deposit that Genome made on December 6, 2013.

38. As a result of RNA's breach of the May 2014 and February 2015 price lists, Genome has been damaged in an amount exceeding $50,000, representing the increased cost RNA charged to manufacture Genome's products and Genome's concurrent lost profits.

**COUNT II – BREACH OF CONTRACT – FAILURE TO PERFORM**

39. Genome hereby incorporates the averments set forth in paragraphs 1 through 38, above, as if set forth in full herein in this paragraph 39.

40. RNA and Genome agreed that RNA would manufacture and deliver all of Genome's products no later than August 11, 2015.

41. Genome performed all material conditions, covenants, and promises required on its part to be performed according to the terms and conditions of this agreement.

42. RNA breach the agreement by

    a. Failing to deliver Genome's products by August 11, 2015;

    b. Failing to deliver the correct quantities that Genome ordered; and

    c. Refusing to cover the cost of shipping of new tubes to RNA caused by RNA's damage to and waste of Genome's products.

43. As a result of RNA's breach of its agreement, Genome has been damaged in an amount in excess of $230,000, representing lost profits, and approximately $15,000 in excess shipping costs.

## **COUNT III – CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES**

44. Genome hereby incorporates the averments set forth in paragraphs 1 through 43, above, as if set forth in full herein in this paragraph 44.

45. RNA's unilateral increase in price to manufacture Genome's products constitutes a deceptive and unfair practice because (1) RNA waited for over a year to mention the need for price increases after RNA and Genome agreed to the prices in the May 2014 price list; and (2) RNA waited until just before it was scheduled to begin manufacturing Genome's products to announce that it was increasing the price to manufacture fourteen (14) products, at which point Genome had no choice but to agree to the increase prices or risk losing sales.

46. RNA's failure to timely manufacture and deliver Genome's products by August 11, 2015, also constitutes a deceptive and unfair practice because RNA knew or should have known that it could not meet the deadline to which it agreed and that Genome would have no choice but to wait for RNA to finish manufacturing the skin care products.

46. RNA intended that Genome rely on these deceptive and unfair practices because RNA waited for over a year to reveal the supposed need for widespread and substantial price increases. RNA also knew that Genome needed its products by August 11, 2015. Genome had been planning its sales and marketing based on the prices contained in the May 2014 price list and agreed to by the parties, and also planned its sales around RNA's representation that the products would be completed by August 11, 2015.

47. RNA's deceptive and unfair practices occurred in the course of conduct involving trade or commerce, in that Genome agreed to have RNA manufacture its products for distribution within the skin care market in the United States and other countries.

48. RNA's deceptive and unfair practices involve trade practices addressed to the market generally because these practices increased the price of Genome's products and delayed Genome's sale and distribution of its products to consumers of skin care products, thereby forcing such consumers to buy other products and negatively affecting Genome's sales.

49. RNA's deceptive and unfair practices proximately caused actual damage to Genome in both increased costs in excess of $50,000, lost profits in excess of $230,000 and excess shipping costs of approximately $15,000.

50. In addition to its actual damages, Genome is also entitled to its reasonable attorney's fees and costs incurred as a result of RNA's deceptive and unfair practices.

## **CONCLUSION**

WHEREFORE, based on the foregoing, Plaintiff Genome Cosmetics, LLC, respectfully requests that this Court enter judgment in its favor and against Defendants for (1) compensatory, incidental and consequential damages caused by RNA Corporation's breach of its agreement to manufacture Genome's products; (2) compensatory damages and reasonable attorney's fees and costs caused by RNA Corporation's consumer fraud and deceptive business practices; and (3) such other and further relief that this Court deems just and proper.

Genome demands a trial by jury pursuant to Fed. R. Civ. P. 38.

Dated: March 17, 2016                                  Respectfully Submitted,


                                                       s/ John P. McCorry
                                                       One of the Attorneys for Plaintiff
                                                       GENOME COSMETICS, LLC

Mark E. Parsky (#6184456)
John P. McCorry (#6280573)
MCVEY & PARSKY, LLC
30 N. LaSalle St., Suite 2100
Chicago, IL  60602
Phone: (312) 551-2130
Fax:    (312) 551-2131
E-mail:  mep@mcveyparsky-law.com
         jpm@mcveyparsky-law.com